1

2

3

4

5

6

7        **UNITED STATES DISTRICT COURT**

8        **DISTRICT OF NEVADA**

9

10   THOMAS SPEAR, *et al*.,

11        Plaintiffs,                          Case No. 2:06-CV-00264-KJD-LRL

12   v.                                        <u>**ORDER**</u>

13   CITY OF NORTH LAS VEGAS, *et al*.,

14        Defendants.

15

16        Presently before the Court is Defendants' Motion for Summary Judgment (#49).  Plaintiffs

17   filed an Opposition (#67), to which Defendants filed a Reply (#70).

18   <u>**I.  Facts and Procedural History**</u>

19        On March 3, 2004, Sean Spear placed an emergency 911 call to the North Las Vegas Police

20   Department ("NLVPD").  He informed the dispatcher that his father, Thomas Spear ("Thomas" or

21   "Plaintiff"), was in their home located at 1002 White Hollow Avenue and was threatening to shoot

22   himself in the head.  He also told the dispatcher that his father was currently in possession of a 9mm

23   handgun.  Sean had previously called a friend who was an officer with the North Las Vegas Police

24   Department for help.

25        At approximately 4:25 p.m. officers Jennifer Hurley and Carey McCloud were dispatched to

26   the Spear home.  After the police arrived, Sean informed them that in addition to the handgun there

1  were at least four rifles and four handguns with armor piercing ammunition in the house.  He told

2  them that his father was a retired Air Force officer with extensive military and weapons training.

3       Sean also told the officers that the prior evening his father, Thomas Spear, and mother, Linda

4  Spear, became involved in a dispute over missing medication.  Linda Spear left the home that

5  evening and had not returned.  The next day Sean checked on his father and found him sitting on his

6  bed holding a handgun.  Sean told the officers that his father had said that he no longer wished to live

7  and promised Sean his automobile collection if Sean let him commit suicide.  Sean became

8  frightened and ran outside to call the police.

9       Officer Hurley then attempted to call Thomas Spear on the house phone which rang without

10 being answered.  Hurley contacted NLVPD Sergeant Michael Waller to advise him of the situation.

11 Waller advised the officers to close off the street and monitor the house.  Waller arrived at 5:10 p.m.

12 Sean repeated what he had told the other officers and gave the police a layout of the interior of the

13 Spear home.

14       At approximately 5:30 p.m., Defendants Captain Joe Chronister and Captain Tony Scott

15 arrived at the command post to monitor the situation.  Waller briefed them on the situation.  At 6:20

16 p.m., crisis negotiators, Susan Shaaf-White, Terrence McAllister, and Randy Carter arrived at the

17 scene.  The negotiators attempted to gather employment and medical history from Nellis Air Force

18 Base.  At 6:30 p.m., Waller called out the Special Weapons and Tactic ("SWAT") squad.  The

19 command post was informed that neighbors had called Linda Spear.  The neighbors reported that

20 Thomas had spoken with Linda within the half hour and informed her that he had taken an overdose

21 of medication.

22       At 6:55 p.m., Special Operations and SWAT arrived on the scene.  They set up a perimeter

23 around the residence, treating the situation as a barricaded subject.  Special Operations was briefed

24 on the background of the situation.  Michael Kincaid, the SWAT commander, was concerned that

25 Thomas would open fire causing the police officers to shoot him, or that he was trying to kill himself

26 with an overdose of medication.

Linda Spear was intercepted by police at a nearby intersection as she tried to return home. Military personnel from Nellis Air Force Base's Office of Special Investigations were also intercepted and taken to the command post. Linda was not allowed to go to the command post, and she returned to her hotel room at the Cannery Hotel. At approximately 7:40 Linda and her daughter, Kristy Lynn Grider were met at their hotel room by Officer Bruce Reeves who asked them not to leave for their own safety.

Rifle teams were deployed on the front and rear of the residence. The team in the rear set up in a second story window of a house across the street from the back of the Spear residence. An immediate action team set up in the front yard to secure Thomas if he left the house. The street light in front of the house was disabled in order to conceal their location. At approximately, 8:00 p.m., these teams were in ready position.

Between 8:00 and 8:30 p.m., crisis negotiators made numerous attempts to telephone Thomas Spear, with no answer, except for the answering machine. Officer's also attempted to use Linda Spear's cell phone in case Thomas was using caller ID to screen calls. At 8:35 p.m., Special Operations attempted to speak with Thomas via bullhorn. They asked Thomas to answer his phone but he did not respond or answer. Sean, down the street at the command post, did not hear the attempt to communicate with his father by bullhorn.

Around the same time, Officer Brown, with the rifle team in the rear, saw Thomas lying prone by the rear sliding glass door. Brown could see Thomas when he moved or sat up, but when he lay completely prone he was out of sight. Brown reported that he could hear the bullhorn from his position in the house across the street from the rear of the Spear home.

In addition to her cell phone, Linda had given officers a key to the house. However, because Thomas was visible through the glass in the rear of the house and he was not responding to officers, Kincaid determined that entry through the front door would not ensure protection for the officers or Thomas.

1    In order to get a better look, Officers Taylor and Ryan were deployed on ladders overlooking

2  the rear wall into the backyard.  Though they could see Thomas lying on the floor near the sliding

3  glass door, they could not see his hands.  Though some lights were on in the house, no lights were on

4  in the room Thomas was in.

5    At about 9:20, a second immediate action team, including Defendant Christopher Corrado

6  and Defendant Travis Snyder, was deployed in the rear, northwest corner of th residence, about 15

7  yards from the rear sliding glass door.  At approximately 9:30 p.m., Taylor fired a "KO1" less lethal

8  munition at the top of the sliding glass door which broke the tempered glass of the door.  A stinger

9  ball distraction device was placed approximately ten feet from the door to distract Thomas from the

10  immediate action team.  Corrado and Snyder had to manually clear the remaining glass from the

11  door, and shouted instructions at Thomas while they did it.

12    Thomas Spear sat up and asked, "What's going on?"  He was grabbed by the immediate

13  action team, dropped in the glass, and slammed up against the spa in the backyard.  Thomas hit his

14  head on the spa.  Thomas suffered a severe laceration to his buttocks and was attended to by medical

15  personnel.  Eventually, Thomas underwent surgery at Nellis Air Force Base to repair the damage.

16    Plaintiffs filed the present action on March 2, 2006.  Plaintiffs allege violations of the Fourth,

17  Fifth and Fourteenth Amendments including a claim for violation of Plaintiffs' rights to familial

18  relationships.  They also allege municipal liability under 42 U.S.C. § 1983 asserting that it is the

19  policy, practice and custom of the NLVPD to tolerate and ratify the excessive use of force by its

20  officers and to negligently hire, train and supervise its officers.  Plaintiffs also allege state law claims

21  for intentional infliction of emotional distress, assault and battery, and false imprisonment.

22    After many extensions of deadlines to file dispositive motions and oppose Defendants'

23  motion for summary judgment, the Court denied further extensions.  Plaintiffs filed their opposition

24  on January 5, 2010.  In their opposition, Plaintiffs included the report of D.P. Van Blaricom.

25  However, the deadline for designation of expert witnesses was May 26, 2009 and the deadline for

26  designation of rebuttal expert witnesses was June 25, 2009.  Van Blaricom's report was never

4

1     produced to Defendants, other than being attached to their opposition.  It appears that Van Blaricom

2     was not retained until December 30, 2009, five months after discovery closed on July 27, 2009.  Van

3     Blaricom's report will be excluded, because it is unauthenticated, lacks foundation, and as a sanction

4     under Federal Rule of Civil Procedure 37 (c)(1) for Plaintiffs' failure to timely disclose the expert

5     under Federal Rule of Civil Procedure 26.

6 **II.  Summary Judgment Standard**

7        Summary judgment may be granted if the pleadings, depositions, answers to interrogatories,

8     and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any

9     material fact and that the moving party is entitled to a judgment as a matter of law.  See Fed. R. Civ.

10     P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The moving party bears the

11     initial burden of showing the absence of a genuine issue of material fact.  See Celotex, 477 U.S. at

12     323.  The burden then shifts to the nonmoving party to set forth specific facts demonstrating a

13     genuine factual issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

14     587 (1986); Fed. R. Civ. P. 56(e).

15        All justifiable inferences must be viewed in the light must favorable to the nonmoving party.

16     See Matsushita, 475 U.S. at 587.  However, the nonmoving party may not rest upon the mere

17     allegations or denials of his or her pleadings, but he or she must produce specific facts, by affidavit

18     or other evidentiary materials as provided by Rule 56(e), showing there is a genuine issue for trial.

19     See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  The court need only resolve factual

20     issues of controversy in favor of the non-moving party where the facts specifically averred by that

21     party contradict facts specifically averred by the movant.  See Lujan v. Nat'l Wildlife Fed'n., 497

22     U.S. 871, 888 (1990); see also Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 345

23     (9th Cir. 1995) (stating that conclusory or speculative testimony is insufficient to raise a genuine

24     issue of fact to defeat summary judgment).  Evidence must be concrete and cannot rely on "mere

25     speculation, conjecture, or fantasy.  O.S.C. Corp. v. Apple Computer, Inc., 792 F.2d 1464, 1467 (9th

26     Cir. 1986). "[U]ncorroborated and self-serving testimony," without more, will not create a "genuine

1  issue" of material fact precluding summary judgment. <u>Villiarimo v. Aloha Island Air Inc.</u>, 281 F.3d

2  1054, 1061 (9th Cir. 2002).

3     Summary judgment shall be entered "against a party who fails to make a showing sufficient

4  to establish the existence of an element essential to that party's case, and on which that party will

5  bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.  Summary judgment shall not be granted

6  if a reasonable jury could return a verdict for the nonmoving party.  See <u>Anderson</u>, 477 U.S. at 248.

7  **III. Qualified Immunity**

8     Defendants aver that qualified immunity bars Plaintiffs' allegations of Constitutional

9  deprivations.  However, because there is a genuine issue of material fact as to Defendants' culpability

10  for Spear's alleged head injury and for being dropped in the glass, the Court denies summary

11  judgment regarding those specific claims only.

12     When the qualified immunity is raised, the Court first determines whether, taken in the light

13  most favorable to the plaintiff, the conduct of an officer violated plaintiffs' Constitutional rights.

14  <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001); <u>see also</u> <u>Pearson v. Callahan</u>, ___ U.S. ___, 129 S.Ct.

15  808, 815 (2009) (noting that the exact sequence of analysis proscribed by <u>Katz v. Saucier</u> is often

16  beneficial, though not required).  If the plaintiff cannot establish a Constitutional violation, then there

17  is no reason for further discussion.  <u>Katz v. Saucier</u>, 533 U.S. at 201.  However, if a plaintiff

18  establishes a violation, the Court then determines whether the right was clearly established.

19  **A.  Constitutional Violations**

20     **1. Excessive Force**

21     The Court examines allegations of excessive force under the interpretation of the Fourth

22  Amendment's prohibition on unreasonable seizures.  <u>Bryan v. MacPherson</u>, 608 F.3d 614, 619-20

23  (9th Cir. 2010).  Under this framework, the Court determines the reasonableness of the force

24  employed by police officers by balancing "the nature and quality of the intrusion on the individual's

25  Fourth Amendment interests against the countervailing governmental interests at stake." <u>Id.</u>

26

6

1  (quoting Graham v. Connor, 490 U.S. 386, 396 (1989)) (internal quotations omitted); see also,

2  Deorle v. Rutherford, 272 F.3d 1272, 1279 (9th Cir. 2001).

3                  i.  Nature and Quality of the Intrusion

4            To determine the nature and quality of the intrusion, the Court first makes an

5  assessment as to the quantum of force employed by Defendants against Plaintiff.  Chew v. Gates, 27

6  F.3d 1432, 1441 (9th Cir. 1994); Bryan, 608 F.3d at 620.  Other than being dragged through the glass

7  and slammed against the spa, the Court finds that Plaintiff's allegations of excessive force fail as a

8  matter of law.

9            First, all other actions complained of involve a low quantum of force.  That conduct

10  was gentle in comparison with the conduct in cases concluding that there was excessive force.  See,

11  e.g. Bryan, 608 F.3d 614 (plaintiff shot with a taser); Deorle v. Rutherford, 272 F.3d 1272 (9th Cir.

12  2001) (shot from a non-lethal weapon removed plaintiff's eye and lodged lead in his skull).

13  Furthermore, the evidence demonstrating those acts does not give rise to a § 1983 claim because it

14  merely shows, if anything, a lack of due care on the part of the officers.  Davidson v. Cannon, 474

15  U.S. 344 (1986).  Negligent conduct on the part of state actors does not give rise to a § 1983 claim.

16  Maddox v. City of Los Angeles, 792 F.2d 1408, 1413 (9th Cir. 1986); see also, Wood v. Ostrander,

17  879 F.2d 583, 588 (9th Cir. 1989) (noting that recovery for negligence does not serve to discourage

18  abuses of power by state officials).

19            To recover for unintentional acts, a state actor's conduct must at least rise to

20  "deliberate indifference."  Wood, 879 F.2d at 588.  The deliberate indifference standard is a *higher*

21  degree of culpability than mere negligence, gross negligence, or recklessness.  Redman v. County of

22  San Diego, 896 F.2d 362, 365 (9th Cir. 1990).  Thus, accepting all of Plaintiffs' alleged facts as true,

23  no reasonable jury could conclude that the police were guilty of deliberate indifference except when

24  they dropped and dragged Plaintiff through the glass and slammed him against the spa.  Accordingly,

25  the Court concludes that Plaintiff has not stated an excessive force claim for any other injuries he

26  received.

7

1    However, a genuine issue of material fact remains as to whether officers acted with

2    deliberate indifference when they dragged Plaintiff through the glass and sat Plaintiff next to the spa,

3    allegedly causing injury to Plaintiff's head.  If in doing so, the police acted with deliberate

4    indifference, then Plaintiff may have a claim under § 1983.  However, if it was mere negligence, or

5    even gross negligence, Plaintiff cannot recover because such evidence does not give rise to a § 1983

6    claim.  See Maddox v. City of Los Angeles, 792 F.2d 1408, 1413 (9th Cir. 1986); see also, Wood v.

7    Ostrander, 879 F.2d 583, 588 (9th Cir. 1989).  What level of force was used and whether it was

8    reasonable are questions for a finder of fact.

9    ii.  Countervailing Governmental Interest

10    To evaluate the government's interest in using force, the Court assesses "the severity

11    of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

12    others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham v.

13    Connor, 490 U.S. at 396.  The second factor regarding the safety of officers or others is the most

14    important.  Smith v. City of Hemet, 394 F.3d 689, 702 (9th Cir. 2005).  There must be objective

15    factors that suggest that there is a threat to a person's safety.  "[A] simple statement by an officer that

16    he fears for his safety or the safety of others is not enough; there must be objective factors to justify

17    such a concern."  Deorle v. Rutherford, 272 F.3d 1272, 1281 (9th Cir. 2001).  However, the Court is

18    not limited to a review of these factors.  The Court can also consider the "totality of the

19    circumstances" and any specific factors that may be appropriate in this case in determining the

20    government's interest in the use of force.  Bryan v. MacPherson, 608 F.3d 614, 622 (9th Cir. 2010).

21    Here, given the totality of the circumstances, and the threat of harm that Spear posed

22    to himself and to those around him, the government had a high interest in removing Plaintiff from the

23    home.  See Deorle v. Rutherford, 272 F.3d at 1281; Bryan v. MacPherson, 608 F.3d at 622.  The

24    police had ample, objective evidence regarding the potential threat to the safety of Spear and others.

25    See Graham v. Connor, 490 U.S. at 396.  For example, NLVPD had visited the residence the

26    previous day for a domestic dispute.  Plaintiff's son, Sean, called 911 and asked for the police's help

1  to prevent Plaintiff's suicide.  When police arrived, Sean told police that Plaintiff had several guns,

2  including armor-piercing ammunition.  Spear was unresponsive to police and negotiators.  These

3  facts strongly suggest that Plaintiff was a potential harm to himself and to those around him.

4  Therefore, the government had a high interest in removing Plaintiff from the home.

5          Furthermore, the totality of circumstances demonstrate that Defendants had a high

6  interest in removing Plaintiff from his home.  See Bryan, 608 F.3d at 622.  Defendants were asked to

7  respond to a potentially dangerous situation, involving a suicidal man who owned several guns.

8          In balancing the government's interest with the nature and quality of the intrusion, the

9  Court finds that Defendants' actions in detaining Thomas reasonable in the circumstances.  However,

10  there is a genuine issue of material fact as to the use of force in dragging Plaintiff through the glass

11  and slamming him against the spa.  Therefore, summary judgment is denied on this specific claim for

12  Thomas's injuries.

13          **2. Unlawful Entry**

14      The Court concludes that Defendants did not make an unlawful entry into Plaintiffs' home.

15  Although police entry into a home without a warrant is typically unlawful, Brigham City, Utah v.

16  Stuart, 547 U.S. 398 (2006), this rule is subject to an exception that allows entry in emergency

17  situations.  "[A] warrantless entry by criminal law enforcement officials may be legal when there is

18  compelling need for official action and no time to secure a warrant."  For example, "The need to

19  protect or preserve life or avoid serious injury is justification for what would be otherwise illegal

20  absent an exigency or emergency."  Mincey v. Arizona, 437 U.S. 385, 392 (1987) (quoting Wayne v.

21  U.S. 318 F.2d 205 (D.C. Cir. 1963).  As part of the police's "community caretaking function," this

22  exception allows police to respond without a warrant to an emergency situation that threatens life or

23  limb.  Hopkins v. Bonvicino, 573 F.3d 752, 763 (9th Cir. 2009).

24      Here, the police entered Plaintiff Spear's home during an emergency situation.  There was a

25  compelling need for action.  The Court finds that the police were acting within their community

26  caretaker function when they responded to Sean Spears's request for help in preventing Plaintiff's

9

1   suicide.  Because police entered the home during an emergency situation to protect life or limb, the

2   Court finds that there was no unlawful entry in this case.  See Hopkins, 573 F.3d at 763.  Therefore,

3   the Court finds that this claim fails as a matter of law.

4          **B.  Clearly Established Right**

5          The Court finds that all of Plaintiffs' allegations are barred by Defendants' qualified

6   immunity, except for Spear being dragged through the glass and slammed against the spa.  Qualified

7   immunity "protects government officials from liability for civil damages insofar as their conduct

8   does not violate clearly established statutory or constitutional rights of which a reasonable person

9   would have known."  Pearson v. Callahan, ___ U.S. ___, 129 S.Ct. 808, 815 (2009) (quoting Harlow

10  v. Fitzgerald, 457 U.S. 800, 818 (1982)) (internal quotations omitted).

11         Because there is a genuine issue of material fact regarding whether officers deliberately

12  dragged Thomas through glass and roughly placed him up against the spa, causing injury to his head,

13  the Court denies summary judgment with respect to that claim.  This use of force, accepting the

14  allegation as true, would constitute a violation of a clearly established right.  Therefore, qualified

15  immunity does not bar Spear's claims against police for that alleged use of force.  The Court,

16  however, grants summary judgment regarding Plaintiff's other allegations of excessive force and for

17  unlawful entry.

18  **IV.  Municipal Liability**

19         Plaintiff's 42 U.S.C. § 1983 claims against the City of North Las Vegas and the North Las

20  Vegas Police Department (NLVPD) fail as a matter of law.  Section 1983 provides,

21         Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any
            State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen
22         of the United States or other person within the jurisdiction thereof to the deprivation of any
            rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the
23         party injured in an action at law, suit in equity, or other proper proceeding for redress…

24  Municipalities and other local government units are included in that group of "persons" referred to in

25  § 1983.  Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 690 (1978).  A plaintiff may

26  establish municipal liability under §1983 by demonstrating one of the following three factors:  1) a

1   city employee violated Constitutional rights either pursuant to an official policy or informal practice

2   of the city, 2) the violator held final policy-making authority, or 3) a person with final policy-making

3   authority ratified the unconstitutional behavior.  Gillette v. Delmore, 979 F.2d 1342, 1346 (9th Cir.

4   1992).

5        **A.  Violation Pursuant to an Official or Unofficial Policy**

6             i.  An Official Policy

7        Plaintiff fails to establish that a NLVPD employee violated his Constitutional rights

8   "pursuant to official municipal policy."  Monell, 436 U.S. at 691.  "Congress did not intend

9   municipalities to be held liable unless action pursuant to official municipal policy of some nature

10  caused a constitutional tort."  Id.  Therefore, "a municipality cannot be held liable solely because it

11  employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a

12  *respondeat superior* theory."  Id.  The official-policy requirement for municipal liability under   §

13  1983 distinguishes the acts of municipal employees from the acts of the municipality, thus

14  determining whether the city is actually responsible for the violation.  Pembaur v. City of Cincinnati,

15  475 U.S. 469, 479 (1986).  Therefore, a "governmental entity is liable under §1983 only when the

16  entity itself is a " 'moving force' " behind the deprivation."  Kentucky v. Graham, 473 U.S. 159, 166

17  (1985) (citations omitted).

18       Plaintiff has not raised a genuine issue of material fact regarding an official NLVPD

19  policy that allows or encourages excessive force such as the alleged head injury here.  Even if the

20  jury determines that the police acted with deliberate indifference when Spear's head was allegedly

21  injured, this evidence is wholly insufficient to establish municipal liability.  To prevail on such a

22  claim, Plaintiff would also need to establish that the police officer did so pursuant to official policy.

23  Plaintiff has failed to do so here.

24            ii.  Unofficial Policy:  Widespread Practice or Custom

25       Even if a plaintiff cannot establish the existence of an official municipal policy, the

26  plaintiff may also establish municipal liability by demonstrating that the municipal employee acted in

11

1    accordance with a "longstanding practice or custom which constitutes the 'standard operating

2    procedure' of the local governmental entity." <u>Jett v. Dallas Independent School District</u>, 491 U.S.

3    701, 737 (1989) (quoting <u>Pembaur</u>, 475 U.S. at 485-87 (White, J., concurring)). "[A] plaintiff may

4    be able to prove the existence of a widespread practice that, although not authorized by written law

5    or express municipal policy, is "so permanent and well settled as to constitute a 'custom or usage'

6    with the force of law." <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988) (citing <u>Adickes v.</u>

7    <u>S.H. Kress & Co.</u>, 398 U.S. 144, 167-68, 90 (1970)). Therefore, "A plaintiff cannot prove the

8    existence of a municipal policy or custom based solely on the occurrence of a single incident or

9    unconstitutional action by a non-policymaking employee." <u>Davis v. City of Ellensburg</u>, 869 F.2d

10    1230, 1233 (9th Cir. 1989) (abrogated on other grounds by <u>Beck v. City of Upland</u>, 527 F.3d 853

11    (9th Cir. 2008)).

12        Here, the evidence is insufficient to establish that NLVPD maintained an

13    unconstitutional "longstanding practice or custom which constitutes the 'standard operating

14    procedure' of the local governmental entity." <u>Jett</u>, 491 U.S. at 737 (quoting <u>Pembaur</u>, 475 U.S. at

15    485-87 (White, J., concurring)). The evidence presented by Plaintiff fails to show that the alleged

16    unconstitutional conduct in this case was so widespread that it constituted a custom with the force of

17    law at the NLVPD. <u>See City of St. Louis</u>, 485 U.S. at 127. Likewise, Plaintiff's evidence supporting

18    this isolated incident fails to establish a pattern of tortious conduct that resulted from inadequate

19    training on the part of NLVPD. Even assuming that a NLVPD officer is liable for the alleged

20    excessive force used against Plaintiff Spear, this is insufficient evidentiary foundation for municipal

21    liability because evidence demonstrating an occurrence of a single incident of unconstitutional

22    behavior fails to establish a municipal policy or custom. <u>See Davis</u>, 869 F.2d at 1233.

23    **B. Policy-Making Authority**

24        Plaintiff failed to establish that a NLVPD employee with policy-making authority used

25    excessive force against him. A litigant wishing to oppose a summary judgment motion must

26    demonstrate *specific* facts that show there is a genuine issue of material fact. Fed. R. Civ. P.

1   56(e)(2).  Plaintiff failed to establish that the alleged tortfeasor held policy-making authority.  Thus,

2   Plaintiff has not established municipal liability based upon this element.

3   **C.  A Person with Policy-Making Authority Ratified the Unconstitutional Behavior**

4         Plaintiff fails to demonstrate that an employee with policy-making authority ratified the

5   alleged police conduct that caused Plaintiff's head injury.  See Davis v. City of Ellensburg, 869 F.2d

6   1230, 1234 (9th Cir. 1989) (denying municipal liability where the plaintiff failed to present evidence

7   that the city acquiesced in unconstitutional behavior).  Police officers may have stated that the plan to

8   extract Plaintiff from his home was proper, but they did not ratify or condone the alleged

9   unconstitutional behavior.  "If the evidence is merely colorable, or is not significantly probative,

10   summary judgment may be granted." Davis, 869 F.2d at 1234 (quoting Anderson v. Liberty Lobby,

11   Inc., 477 U.S. 242, 249-50 (1986) (citations omitted)).  Because the evidence in the record does not

12   raise a genuine issue of material fact regarding a ratification of unconstitutional conduct at NLVPD,

13   the Court grants summary judgment on this claim against NLVPD.

14   **V.  Interference with Familial Relationship**

15         Defendants are entitled to qualified immunity on Plaintiffs' claim for interference with

16   familial relationship, because no clearly established law would have put Defendants on notice under

17   the facts of this case that their actions were illegal.  In opposition to Defendants' motion for summary

18   judgment, Plaintiffs have failed to identify a single fact demonstrating that Defendants were

19   deliberately indifferent to their right to a familial relationship.  Wallis v. Spencer, 202 F.3d 1126 (9th

20   Cir. 2000).  Accordingly, Plaintiffs' third cause of action is dismissed.

21   **VI. Discretionary Immunity Pursuant to State Law**

22         Martinez v. Maruszczak, 123 Nev. 433, 168 P.3d 720 (2007) adopted the general principles

23   of federal jurisprudence as to discretionary-function immunity, id. at 727, holding that the actions of

24   state actors are entitled to discretionary-act immunity if their decision (1) involves an element of

25   individual judgment or choice and (2) is based on considerations of social, economic, or political

26   policy, id. at 729. The Nevada Supreme Court clarified that "decisions at all levels of government,

13

1  including frequent or routine decisions, may be protected by discretionary-act immunity, if the

2  decisions require analysis of government policy concerns." Id.

3         To the extent that any of Plaintiffs' claims could be construed as negligent training or

4  supervision claims under state law, Defendants are entitled to discretionary immunity as the Ninth

5  Circuit has held "decisions relating to the hiring, training and supervision of employees usually

6  involve policy judgment of the type Congress intended the discretionary function exception to

7  shield." Vickers v. United States, 228 F.3d 944, 950 (9th Cir. 2000); Bryan v. Las Vegas Metro.

8  Police Dept't, 349 Fed. Appx. 132, 134  (9th Cir. 2009).  The individual defendants are also

9  protected under Nev. Rev. Stat. § 41.032 from the state law torts, because their handling of the

10 situation with Thomas Spear led to discretionary decisions that "were concerning the scope and

11 manner in which [North Las Vegas Police Department] conducts an investigation," or responds to an

12 emergency call based on the policies of North Las Vegas Police, and did not "violate a mandatory

13 directive." Vickers, 228 F.3d at 951; Bryan, 349 Fed. Appx. at 134.  Accordingly, Plaintiffs state law

14 claims are dismissed.

15 **VII.  Conclusion**

16        Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment

17 (#49) is **GRANTED in part and DENIED in part**;

18        **IT IS FURTHER ORDERED** that all Plaintiffs' claims except Thomas Spears' claims for

19 excessive force are **DISMISSED**.

20        DATED this 30th day of September 2010.

21

22

23                                        _____

24                                        Kent J. Dawson
                                         United States District Judge

25

26

14